**GOOD | GUSTAFSON | AUMAIS LLP**
RYAN GUSTAFSON, SBN 220802
2330 Westwood Boulevard, Suite 103
Los Angeles, California 90064
Telephone: (310) 274-4663
jrg@ggallp.com

**SHENAQ PC**
Amir Shenaq, Esq.*
3500 Lenox Road, Ste. 1500
Atlanta GA 30326
Tel: (888) 909-9993
amir@shenaqpc.com

**THE KEETON FIRM LLC**
Steffan T. Keeton, Esq.*
100 S Commons, Ste 102
Pittsburgh PA 15212
Tel: (888) 412-5291
stkeeton@keetonfirm.com

*Pro hac vice* forthcoming

*Counsel for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Angela Davis and Bonnie Bennett, individually, and on behalf of those similarly situated, | CASE NO. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | **Demand for  Jury Trial** |
| v. | |
| Rebel Creamery LLC, | |
| Defendant. | |

GOOD GUSTAFSON AUMAIS LLP

Plaintiffs Angela Davis and Bonnie Bennett bring this action on behalf of themselves and all others similarly situated against Defendant Rebel Creamery LLC ("Rebel" or "Defendant"). Plaintiffs make the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

"Yeah, I personally think it best everyone is skeptical of the FDA and any nutrition label, to start. Brands need to earn trust on what exactly their claims are. Keto is hot right now, so money and products will pour in. Some will be great products, some will be bogus. Best not trust the FDA to make the right calls or moves no matter what."

*Rebel Creamery[1]*

1.     This case arises out of Defendant's deceptive, misleading, and unlawful practices with respect to its marketing and sale of its Rebel ice cream which is sold in a variety of flavors (collectively, the "Product" or "Products").[2]

2.     Defendant manufactures, sells, and distributes the Products using a marketing and advertising campaign focused on claims that appeal to health-conscious consumers.

3.     Defendant engages in a deceptive marketing campaign to convince consumers that the Products are nutritious and healthful to consume, and are more healthful than similar products.

---

[1] *Rebel Creamery's Official Reddit Account*, May 9, 2020.
[2] At the time of this filing, the following Rebel products that are included in this definition are attached as Exhibit A. This definition is not exhaustive, and shall include all of Defendant's products that are similarly deceptively marketed.

4.      Defendant's marketing stresses the importance of fat consumption, the health benefits of high fat diets, and the healthy nature of its Products.

5.      For example, all Products have the following description printed on the label:

> Many have discovered that eating foods high in healthy fats and low in carbs/sugar trains your body to burn fat instead of sugar as an energy source. Common benefits people may experience on a low carb, high fat diet are weight loss, increased energy, suppressed appetite, and mental clarity.

6.      However, this is false, misleading, and deceptive because Defendant's Products contain high amounts of unsafe fats which increase the risk of severe health issues, including coronary heart disease – the number one killer of Americans every year.

7.      In comparison, every flavor of the Products contains more saturated fat per serving than a Burger King Cheeseburger, an Arby's Classic Roast Beef Sandwich, a KFC Fried Chicken Breast, or three large orders of McDonald's fries.

8.      Moreover, in violation of federal and state regulations, Rebel attempts to perpetuate this deception by prominently making health focused nutrient content claims on the labeling of its Products, without making mandatory disclosures, in an effort to mislead and deceive consumers that its Products are healthy.

9.      Additionally, Rebel includes unauthorized nutrient content claims to induce buyers into buying its products.

10.     Defendant's myth that its Products are healthy is perpetuated in additional forms of marketing. For example, on its website, Defendant states:

CLASS ACTION COMPLAINT

**HEALTHY ICE CREAM?**

Eating healthy is far more than just counting calories. It's counting the makeup of those calories. 100 calories of sugar has a very different impact on your body than 100 calories of healthy fats.

We believe the healthiest diet is one high in healthy fats, moderate in protein, and very low in sugar. Rebel Ice Cream uses only all-natural, high quality ingredients that are keto-friendly. All ingredients are very low glycemic and will not kick you out of a fat-burning state. We sweeten the ice cream with natural sweeteners that don't raise your blood sugar or upset your stomach.

But Rebel Ice Cream isn't like other "healthy" ice creams. The high fat content gives it the creamy texture of real ice cream. The perfect blend of natural sweeteners gives it the sweetness of real ice cream. In other words, *this is real ice cream* without any of the sugar! However, since there is no sugar, it is best to let the ice cream soften for 10-15 minutes before you eat it.

11.    Reasonable consumers purchased the Products believing, among other things, that they were accurately represented. Specifically, reasonable consumers believed that the Products contained accurate label information and representations. Reasonable consumers would not have purchased the Products if they had known about the misrepresentations and omissions, or would have purchased them on different terms.

12.    In stark contrast to the healthy representations, Rebel's Products contain unhealthy levels of saturated fat. In its discussion of saturated fat, the American Heart Association states, "Decades of sound science has proven it can raise your "bad" cholesterol and put you at higher risk for heart disease."[3]

---

[3] American Heart Association, *Saturated Fat*, http://www.heart.org/en/healthy-living/healthy-eating/eat-smart/fats/saturated-fats.

GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP

13.     Cardiovascular Disease is the leading cause of death for men and women in the United States, taking one life every 37 seconds.[4]

14.     Plaintiffs bring this action individually and on behalf of those similarly situated and seeks to represent a National Class and a California Class. Plaintiffs seek damages, interest thereon, reasonable attorneys' fees and costs, restitution, other equitable relief, and disgorgement of all benefits Defendants have enjoyed from their unlawful and/or deceptive business practices, as detailed herein. In addition, Plaintiffs seek injunctive relief to stop Defendants' unlawful conduct in the labeling and marketing of the Products and conduct a corrective advertising campaign.

## JURISDICTION AND VENUE

15.     This Court has personal jurisdiction over Defendant. Defendant purposefully avails itself of the California consumer market and distributes the Products to many locations within this District and hundreds of retail locations throughout the State of California, where the Products are purchased by thousands of consumers every day.

16.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed Plaintiffs class, any member of the Plaintiffs class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiffs allege that the total claims of individual

---

[4] Heron M., *Deaths: Leading causes for 2017*, NATIONAL VITAL STATISTICS REPORTS; vol. 68 no. 6, National Center for Health Statistics. 2019 *available at* https://www.cdc.gov/nchs/data/nvsr/nvsr68/nvsr68_06-508.pdf.

CLASS ACTION COMPLAINT

1  members of the proposed Class (as defined herein) are well in excess of $5,000,000.00
2  in the aggregate, exclusive of interest and costs.

3     17.   Venue is proper in this District under 28 U.S.C. § 1391(a). Plaintiff
4  Davis' purchases of Defendant's Products, substantial acts in furtherance of the
5  alleged improper conduct, including the dissemination of false and misleading
6  information regarding the nature, quality, and/or ingredients of the Products,
7  occurred within this District and the Defendant conducts business in this District.

8
9                    **DIVISIONAL ASSIGNMENT**
10    18.   Pursuant to Civil Local Rule 3-2(c-d), a substantial part of the events
11 giving rise to the claims arose in Sonoma County, and this action should be assigned
12 to the San Francisco Division.

13
14                         **PARTIES**
15    19.   Plaintiff Angela Davis is a citizen of California.
16    a.  Prior to purchase, Plaintiff Davis saw and relied on Defendant's
17        marketing and labeling representing that the Products were healthy,
18        healthful, better for her, and a healthier alternative to the competition.
19    b.  Plaintiff Davis has purchased the Product on multiple occasions in
20        Sonoma and Mendocino Counties. She has purchased the Vanilla and
21        Strawberry flavors. Plaintiff Davis' most recent purchase of the Product
22
23        occurred in January 2021 in Sonoma County.
24    20.   Plaintiff Bonnie Bennett is a citizen of Michigan.
25    a.  Prior to purchase, Plaintiff Bennett saw and relied on Defendant's
26        marketing and labeling representing that the Products were healthy,
27        healthful, better for her, and a healthier alternative to the competition.
28

**GOOD GUSTAFSON AUMAIS LLP**

b.   Plaintiff Bennett has purchased the Products on multiple occasions in Michigan. She has purchased the Vanilla and Chocolate flavors. Plaintiff Bennett's most recent purchase of the Products occurred in March 2021.

21.   Plaintiffs purchased the Products for personal consumption. When Plaintiffs saw Defendant's misrepresentations prior to and at the time of purchase, they relied on Defendant's prominent representations and claims about the Products. Specifically, that it was healthy, healthful, better for them, and a healthier alternative to the competition. Defendant emphasizes these representations in the marketing and on the labeling of the Product.

22.   Plaintiffs relied on the Defendant's representations made on the Product that it was a "healthy," "low carb," contained "healthy fats," that it assisted with "weight loss, increased energy, suppressed appetite, and mental clarity."

23.   Plaintiffs understood these representations to mean that the Product was healthy, healthful, better for them, and a healthier alternative to the competition. Had Plaintiffs known the truth – that it failed to conform to those representations, and rather, it contained dangerously high levels of saturated and trans fats – Plaintiffs would not have purchased the Product at a premium price.

24.   Plaintiffs have enjoyed the Products in the past. If they could be assured through prospective injunctive relief that the Products are properly labeled, they would consider purchasing the Products in the future.

25.   Plaintiffs bring the claims below seeking damages, actual and statutory, as well as injunctive relief.

26.   Defendant Rebel Creamery LLC is a Utah company with its principal place of business in Midway, UT.

27.     Defendant produces, markets and distributes its consumer food products in retail stores across the United States including stores physically located in the State of California and in this District.

28.     Plaintiffs reserve the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who have knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

## SUBSTANTIVE ALLEGATIONS

**A. Defendant Makes, Markets, and Sells the Product to Consumers.**

29.     Defendant manufactures, labels, and advertises the Products.

30.     Defendant markets and labels the Products with the representations as described herein. While the following example shows the Peanut Butter Fudge flavor, all of the Products contain the same healthy and health-focused representations.

31.     Specifically, all Products contain: (1) representations that the Products are healthful and beneficial to health, (2) representations that the fats contained therein are healthy, (3) representations that the Products contribute to weight loss, increased energy, suppressed appetite, and mental clarity, (4) representations that the Products are "low carb," and (5) material omissions that fail to include mandatory disclosures and contribute to these deceptions by not informing consumers that the Products are not healthy as represented.

32.     Further, each product bears the following description on the label of each product:[5]

_____

[5] Emphasis added.

GOOD GUSTAFSON AUMAIS LLP

Many have discovered that eating foods high in **healthy fats** and low in carbs/sugar trains your body to burn fat instead of sugar as an energy source. Common benefits people may experience on a low carb, high fat diet are **weight loss**, **increased energy**, **suppressed appetite**, and **mental clarity**.

33.     The following images display the front label, the side label, and the Nutrition Facts panel:



<em>GOOD GUSTAFSON AUMAIS LLP</em>

GOOD GUSTAFSON AUMAIS LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





GOOD GUSTAFSON AUMAIS LLP

34.     On each Products' label, as shown above, the Defendant prominently represents that each product contains "healthy fats."

35.     Additionally, each label prominently features the calculated Net Carb amount contained within each respective product.

36.     Further, on each Products' lid, the following representations encircle and repeat: "no sugar added, high fat, low carb, keto."

37.     The labeling fails to warn and fails to include disclosures related to the large amounts of dangerous fats contained therein.

38.     Defendant markets and labels the Products with the representations as described herein. While the above example shows the Peanut Butter Fudge flavor, all of the Products contain similar healthy representations.

39.     Defendant further misrepresents the healthfulness of its Products on its website, purports that its Products are healthier than competitor products, misrepresents the daily recommended values, and presents itself as an expert on "healthy fats."

40.     For example, Defendant's website provides a comparison chart which presents a detailed analysis concerning the composition and characteristics of various ice cream products:[6]

---

[6] Rebel Creamery Official Website, https://rebelcreamery.com/pages/about.

Pint Comparison Chart

| | Rebel | Halo Top | Halo Top Keto Series | Enlightened | Enlightened Keto Collection | Breyers CarbSmart | Arctic Zero | So Delicious NSA | Häagen-Dazs | Ben & Jerry's |
|---|---|---|---|---|---|---|---|---|---|---|
| Base | Cream | Skim Milk | Skim Milk Cream | Skim Milk | Cream Skim Milk | Milk | Water | Water (coconut milk) | Cream | Cream |
| Net Carb Range | 4-8g | 24-40g | 5-10g? | 12-36g | 4-12g? | 28g | 20-48g | 12-20g | 76-128g | 84-152g |
| Fat Range | 50-70g | 8-14g | 29-54g | 6-24g | 60-68g | 20g | 0-10g | 32-44g | 52-92g | 48-104g |
| Sweeteners / Fibers | Erythritol Monk Fruit Chicory Root | Erythritol Sugar Stevia Corn Fiber | Erythritol, Stevia Sugar, Maltitol Corn Fiber Chicory Root Corn Starch | Erythritol Sugar (most) Stevia Corn Fiber | Erythritol Sugar (one) Monk Fruit Corn Fiber | Sorbitol Maltodextrin Splenda Corn Fiber | Sugar Corn Fiber | Erythritol Monk Fruit Chicory Root | Sugar | Sugar |
| Total Sugar per pint | 0-2g | 24-32g | 4-7g | 16-28g | 4-6g? | 9-12g | 20-40g | 4-6g | 76-128g | 84-152g |

41.    Defendant notably omits the saturated fat and trans fat composition in this comparison while also stating "85-90% of the calories in Rebel Ice Cream come from healthy animal fats…."[7]

42.    In stark contrast, the fat content of its products includes high amounts of saturated fats and trans fat.

43.    For example, the fat content of the Peanut Butter Fudge flavor consists of 52.6% saturated fat.

44.    Further, the Peanut Butter Fudge flavor contains trans fats. Trans fat has been described as "the most harmful fat of all, causing 50,000 fatal heart attacks annually."[8]

45.    Further, when consumers raise concerns regarding the dangerous fats included in the Products, Defendant counters:[9]

---

[7] *Id.*
[8] CENTER FOR SCIENCE IN THE PUBLIC INTEREST, *Trans fat*, https://cspinet.org/eating-healthy/foods-avoid/trans-fats.
[9] Emphasis added.

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOOD GUSTAFSON AUMAIS LLP



46.    Defendant also represents that the Products are healthy and contain "healthy fat" in online advertising.

47.    For example, the representations are included in its paid advertisements on Google.

48.    From the label to marketing across multiple platforms, Defendant represents to consumers that its Products are healthy and contain healthy fats.

**B. The Composition of Rebel Ice Cream**

49.    Rebel Ice Cream is sold in a variety of flavors.

50.    Regardless of the flavor, every variety of Rebel Ice Cream shares the following same composition and contains:

    a.  High levels of fat;

    b.  High levels of saturated fat;

    c.  High levels of trans fat; and

    d.  High levels of cholesterol.

51.    As demonstrated by the studies cited herein, consuming Rebel Ice Cream is unhealthy as it increases risk of CHD, stroke, and other morbidity

CLASS ACTION COMPLAINT

## C.  The Products Contain High Levels of Saturated and Trans Fat.

52.     Defendant's Product contains high levels of saturated fat.

53.     As demonstrated by the studies cited below, consuming the Product is unhealthy as it increases risk of CHD, stroke, and other morbidity.

54.     These high levels of saturated fat are present even when consumed in small amounts.

55.     One serving of the Product contains 10 to 14 grams of saturated fat in a single serving.

56.     For example, one serving of the Product has more saturated fat than three large orders of McDonald's fries.[10]

57.     Additionally, one serving of the Product has the same amount of saturated fat as one KFC Fried Chicken breast and four KFC Fried Chicken drumsticks combined.[11]

58.     The Product contains saturated fat levels that exceed thresholds of concern as dictated by the FDA.

59.     The Product also contains trans fat which is "not essential and provide[s] no known benefit to human health."[12]

[10] An entire large order of McDonald's fries contains 3 grams of saturated fat. McDonald's French Fries Nutritional Information, https://www.mcdonalds.com/us/en-us/product/large-french-fries.html.
[11] KFC Nutrition Guide, https://www.kfc.com/full-nutrition-guide.
[12] Food Labeling; Health Claim; Phytosterols and Risk of Coronary Heart Disease; Proposed Rule, 75 Fed Reg. 76526, 76542 (Dec. 8, 2010).

**D. Because of its High Saturated Fat and Trans Fat Content, Rebel Ice Cream Detrimentally Impacts Health, and Increases Risk of Cardiovascular Disease and Other Morbidity**

**a. Saturated Fat Consumption Increases the Risk of Cardiovascular Disease and Other Morbidity**

60.    Cholesterol is a waxy, fat-like substance found in the body's cell walls. The body uses cholesterol to make hormones, bile acids, vitamin D, and other substances. The body synthesizes all the cholesterol it needs, which circulates in the bloodstream in packages called lipoproteins, of which there are two main kinds—low density lipoproteins, or LDL cholesterol, and high-density lipoproteins, or HDL cholesterol.

61.    LDL cholesterol is sometimes called "bad" cholesterol because it carries cholesterol to tissues, including the arteries. Most cholesterol in the blood is LDL cholesterol.

62.    HDL cholesterol is sometimes called "good" cholesterol because it takes excess cholesterol away from tissues to the liver, where it is removed from the body.

63.    Total and LDL cholesterol blood levels are two of the most important risk factors in predicting coronary heart disease (CHD), with higher total and LDL cholesterol levels associated with increased risk of CHD.[13]

64.    High LDL cholesterol levels are dangerous because "[e]levated blood LDL cholesterol increases atherosclerotic lipid accumulation in blood vessels."[14] That

---

[13] *See, e.g.,* Dr. Dustin Randolph, Coconut Oil Increases Cardiovascular Disease Risk and Possible Death Due to Heart Attacks and Stroke (Sept. 19, 2015) ("Heart attack and stroke risk can be largely predicted based on total and LDL cholesterol levels in people" because "as cholesterol levels increase so does one's risk of symptomatic and deadly heart disease."), *available at* http://www.pursueahealthyyou.com/2015/04/coconut-oil-increasescardiovascular.html.

[14] USDA Center for Nutrition Policy and Promotion, Dietary Saturated Fat and Cardiovascular Health: A Review of the Evidence, Nutrition Insight 44 (July 2011) [hereinafter, "USDA Review of the Evidence"], *available at*

GOOD GUSTAFSON AUMAIS LLP

is, if there is too much cholesterol in the blood, some of the excess may become trapped along artery walls. Built up formations of cholesterol on arteries and blood vessels are called plaque. Plaque narrows vessels and makes them less flexible, a condition called atherosclerosis.

65.     Thus, "[f]or the health of your heart, lowering your LDL cholesterol is the single most important thing to do."[15]

66.     The consumption of saturated fat negatively affects blood cholesterol levels because the body reacts to saturated fat by producing cholesterol. More specifically, saturated fat consumption causes coronary heart disease by, among other things, "increas[ing] total cholesterol and low density lipoprotein (LDL) cholesterol."[16]

67.     Moreover, "[t]here is a positive linear trend between total saturated fatty acid intake and total and low density lipoprotein (LDL) cholesterol concentration and increased risk of coronary heart disease (CHD)."[17]

68.     This linear relationship between saturated fat intake and risk of coronary heart disease is well established and accepted in the scientific community.

69.     For example, the Institute of Medicine's Dietary Guidelines Advisory Committee "concluded there is strong evidence that dietary [saturated fatty acids]

---

http://www.cnpp.usda.gov/sites/default/files/nutrition_insights_uploads/Insight44.pdf.

[15] Pritikin Longevity Center, Is Coconut Oil Bad for You?, *available at* https://www.pritikin.com/your-health/healthy-living/eating-right/1790-is-coconut-oil-badfor-you.html.

[16] USDA Review of the Evidence, *supra* note 14.

[17] Institute of Medicine, Dietary Reference Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids, at 422 (2005) [hereinafter "IOM Dietary Reference Intakes"], *available at* http://www.nap.edu/catalog.php?record_id=10490.

GOOD GUSTAFSON AUMAIS LLP

SFA increase serum total and LDL cholesterol and are associated with increased risk of [cardiovascular disease] CVD."[18]

70.     In addition, "[s]everal hundred studies have been conducted to assess the effect of saturated fatty acids on serum cholesterol concentration. In general, the higher the intake of saturated fatty acids, the higher the serum total and low density lipoprotein (LDL) cholesterol concentrations."[19]

71.     Importantly, there is "no safe level" of saturated fat intake because "any incremental increase in saturated fatty acid intake increases CHD risk."[20]

72.     For this reason, while the Institute of Medicine sets tolerable upper intake levels (UL) for the highest level of daily nutrient intake that is likely to pose no risk of adverse health effects to almost all individuals in the general population, "[a] UL is not set for saturated fatty acids."[21]

73.     In addition, "[t]here is no evidence to indicate that saturated fatty acids are essential in the diet or have a beneficial role in the prevention of chronic diseases."[22]

74.     Further, "[i]t is generally accepted that a reduction in the intake of SFA [saturated fatty acids] will lower TC [total cholesterol] and LDL-cholesterol."[23]

75.     For these reasons, "reduction in SFA intake has been a key component of dietary recommendations to reduce risk of CVD."[24]

---

[18] USDA Review of the Evidence, *supra* note 14.
[19] IOM Dietary Reference Intakes, *supra* note 17.
[20] Id. at 422.
[21] *Id.*
[22] *Id.* at 460.
[23] Shanthi Mendis et al., Coconut fat and serum lipoproteins: effects of partial replacement with unsaturated fats, 85 Brit. J. Nutr. 583, 583 (2001).
[24] USDA Review of the Evidence, *supra* note 14.

GOOD GUSTAFSON AUMAIS LLP

76.     The Institute of Medicine's Dietary Guidelines for Americans, for example, "recommend reducing SFA intake to less than 10 percent of calories." And "lowering the percentage of calories from dietary SFA to 7 percent can further reduce the risk of CVD."[25]

77.     Professor Frank Sacks from Harvard's T.H. Chan School of Public Health believes that "[t]he evidence that saturated fat causes atherosclerosis and heart disease is compelling."[26]

78.     In short, consuming saturated fat increases the risk of CHD and stroke.[27]

   **b. Trans Fat Consumption Increases the Risk of Cardiovascular Disease and Other Morbidity**

79.     Trans fat is "not essential and provide[s] no known benefit to human health."[28]

80.     While providing no benefit, trans fat create great risk for consumers: "any incremental increase in trans fatty acid intake increases the risk of CHD."[29]

81.     Further, trans fat has been described as "the most harmful fat of all, causing 50,000 fatal heart attacks annually."[30]

---

[25] *Id.*

[26] Liebman, Bonnie, *Saturated fats: the big picture*, CENTER FOR SCIENCE IN THE PUBLIC INTEREST (Oct. 30, 2021), https://www.cspinet.org/article/saturated-fats-big-picture.

[27] Shanthi Mendis et al., Coconut fat and serum lipoproteins: effects of partial replacement with unsaturated fats, 85 Brit. J. Nutr. 583, 583 (2001).

[28] Food Labeling; Health Claim; Phytosterols and Risk of Coronary Heart Disease; Proposed Rule, 75 Fed Reg. 76526, 76542 (Dec. 8, 2010).

[29] *Id.*

[30] https://cspinet.org/eating-healthy/foods-avoid/trans-fats

**E. Defendant Violates Identical Federal and State Regulations**

    **a.    Federal and State Regulations Are Identical**

82.    The FDA oversees the regulation and labeling of food pursuant to the Federal Food, Drug and Cosmetic Act ("FDCA").

83.    The Federal Food, Drug, and Cosmetic Act expressly authorizes state regulations, such as the Sherman Law, that are "identical to the requirement[s]" of the FDCA and federal regulations. *See* 21 U.S.C. § 343-1.

84.    California's Sherman Food, Drug and Cosmetic Law, Cal. Heath & Saf. Code § 110765 et seq. (the "Sherman Law"), incorporates all food labeling regulations promulgated by the FDA under the FDCA. *See e.g.*, Cal. Heath & Saf. Code § 110100(a) ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state."), § 110380 and § 110505.

85.    Because the Sherman Law's requirements are identical to the requirements of the Federal Food, Drug, and Cosmetic Act and FDA regulations the Sherman law is explicitly authorized by the FDCA.

    **b.    Regulations Governing the Labeling of Food Products**

86.    Defendant's deceptive statements described herein violate Cal. Health & Safety Code § 110660 and 21 U.S.C. § 343(a), which both deem a food misbranded if its labeling is "false or misleading in any particular."

87.    As described above, the Products' labeling contains numerous statements that are false or misleading because they state, suggest, or imply that it is

GOOD GUSTAFSON AUMAIS LLP

1

2

healthful, conducive to health, and won't detriment health, which render it misbranded.

88.    In addition, the Product's labeling is misleading, and thus misbranded, because "it fails to reveal facts that are material in light of other representations." 21 C.F.R § 1.21.

89.    Defendant's voluntary and affirmative misrepresentations challenged herein "fail[ed] to reveal facts that are material in light of other representations made or suggested by the statement[s], word[s], design[s], device[s], or any combination thereof," in violation of 21 C.F.R. § 1.21(a)(1). Such omitted facts include the detrimental health consequences of consuming the Products.

90.    Defendant fails to include mandatory disclosure statements that must alert consumers to examine the Nutrition Information because the Product contains high levels of fat and saturated fat. These disclosures are mandatory because the Product contains numerous nutrient content claims, and because the Product contains these high, dangerous levels, they are required so consumers can put these claims in their proper context.

91.    For example, numerous competitors follow this regulation and provide proper disclosure statements when required:

a.  This competitor has similar fat and saturated fat level yet makes no nutrient content claims and includes no disclosure statement:



b.  In contrast, another competitor that includes numerous nutrient content claims *including* the unauthorized "low carb" claim (like Defendant) yet includes a disclosure statement:[31]



92.  Defendant similarly failed to reveal facts that were "[m]aterial with respect to the consequences which may result from use of the article under" both

---

[31] Product excerpted to zoom in on disclosure statement. Emphasis added in red.

GOOD GUSTAFSON AUMAIS LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GOOD GUSTAFSON AUMAIS LLP

"[t]he conditions prescribed in such labeling," and "such conditions of use as are customary or usual," in violation of § 1.21(a)(2). Namely, Defendant failed to disclose the presence of high levels of saturated fat, and Defendant failed to disclose the increased risk of serious chronic disease likely to result from the usual consumption of its Products.

        **c.**    **The Products are Misbranded Because the Labeling Makes Unauthorized Nutrient Content Claims**

93.    The Products are misbranded because the labeling contains unauthorized nutrient content claims.

94.    Under 21 U.S.C. § 343(r)(1)(A), a claim that characterizes the level of a nutrient which is of the type required to be in the labeling of the food must be made in accordance with a regulation promulgated by the Secretary (or, by delegation, FDA) authorizing the use of such a claim. See also Cal. Health & Safety Code § 110670 ("Any food is misbranded if its labeling does not conform with the requirements for nutrient content or health claims" set by federal law.).

95.    Characterizing the level of a nutrient on food labels and the labeling of a product without complying with the specific requirements pertaining to nutrient content claims for that nutrient renders a product misbranded under 21 U.S.C. § 343(r)(1)(A).

96.    The Products are misbranded and misleading because the labeling bears nutrient content claims using the term healthy, while failing to meet the requirements for making such implied nutrient content claims as set forth in 21 C.F.R. § 101.65(d).

97.     For example, on each product, the Defendant represents that the Products contain healthy fats which are beneficial to weight loss, appetite suppression, mental clarity, and increased energy.

98.     These requirements were created to protect consumers and the general public from deception in making food purchases.

99.     To "use the term 'healthy' or related terms (e.g., 'health,' 'healthful,' 'healthfully,' 'healthfulness,' 'healthier,' 'healthiest,' 'healthily,' and 'healthiness') as an implied nutrient content claim on the label or in labeling of a food that is useful in creating a diet that is consistent with dietary recommendations," a food must satisfy specific "conditions for fat, saturated fat, cholesterol, and other nutrients." 21 C.F.R § 101.65(d)(2).

100.    The Products are "not specifically listed" in the table contained in 21 C.F.R § 101.65(d)(2)(i), and therefore are governed by section (F) of the table. *See* 101.65(d)(2)(i)(F).

101.    Under 21 C.F.R. § 101.65(d)(2)(i)(F), to use a "healthy" term, a food must (1) be "Low fat as defined in § 101.62(b)(2)," (2) be "Low saturated fat as defined in § 101.62(c)(2)," (3) be consistent with "The disclosure level for cholesterol specified in § 101.13(h)," and (4) contain "At least 10 percent of the RDI [recommended daily intake] or the DRV [dietary reference values] per RACC [reference amount customarily consumed] of one or more of vitamin A, vitamin C, calcium, iron, protein or fiber." *See* 21 C.F.R. § 101.65(d)(2)(i)(F) (incorporating by reference total fat requirement, 21 C.F.R. § 101.62(b)(2), and saturated fat requirement, 21 C.F.R. § 101.62(c)(2)). In addition, the food must comply "with the definition and declaration

GOOD GUSTAFSON AUMAIS LLP

1
2
requirements in this part 101 for any specific nutrient content claim on the label or in labeling." 21 C.F.R. § 101.65(d)(2)(iii).

3
4
5
6
102.    Section 101.62(b)(2)(i)(A) provides the applicable definition of "low fat" for the Products because they have a RACC (reference amounts customarily consumed) "greater than 30 g or greater than 2 tablespoons."

7
8
103.    Under section 101.62(b)(2)(i)(A), a food is low fat only if it "contains 3 g or less of fat per reference amount customarily consumed."

9
10
11
12
104.    The Products all contain more than 3 grams of fat per RACC. Thus the Products do not meet the total fat requirement in section 101.65(d)(2)(i)(F), and as a result, the use of a "healthy" term renders the Products misbranded.

13
14
15
105.    Under section 101.62(c)(2), a food is "low saturated fat" only if it "contains 1 g or less of saturated fatty acids per reference amount customarily consumed and not more than 15 percent of calories from saturated fatty acids."

16
17
18
19
20
106.    The Products contain more than 1 gram of saturated fat per RACC. The Products therefore do not meet the saturated fat requirement in section 101.65(d)(2)(i)(F), and as a result, their use of a "healthy" term renders the Product misbranded.

21
22
23
107.    Under section 101.13(h), a food must contain 60mg or less cholesterol per RACC.

24
25
26
27
108.    The Products contain more than 60mg of cholesterol per RACC. The Products therefore do not meet the cholesterol requirement in section 101.65(d)(2)(i)(F), and as a result, their use of a "healthy" term renders the Product misbranded.

28

GOOD GUSTAFSON AUMAIS LLP

109.   Further, under section 101.13(h), if a food product makes a nutrient content claim, and it exceeds 13.0g of fat, 4.0g of saturated fat, or 60mg of cholesterol, "then that food must bear a statement disclosing that the nutrient exceeding the specified level is present in the food as follows: "See nutrition information for __ content" with the blank filled in with the identity of the nutrient exceeding the specified level, e.g., 'See nutrition information for fat content.'"

110.   The Products exceed all three of these amounts per serving. Moreover, the Products do not have any disclosure statements. There Products therefore do not meet the disclosure requirements under section 101.13(h), and as a result, the Products are misbranded.

111.   Additionally, Defendant uses the nutrient content claim  "low carb" which is prohibited because there is no definition for "low carb."

112.   "[A] claim about the level of a nutrient in a food in relation to the Reference Daily Intake (RDI) established for that nutrient in §101.9(c)(8)(iv) or Daily Reference Value (DRV) established for that nutrient in §101.9(c)(9), (**excluding total carbohydrates**) may only be made on the label or in labeling of the food if …" 21 C.F.R. § 101.54(a) (emphasis added).

113.   Thus, the Product is additionally misbranded because it makes the unauthorized nutrient content claim "low carb."

114.   In total, Defendant makes the following unauthorized nutrient content claims: "healthy" and "low carb."

115.   Plaintiffs and Class Members would not have purchased the Products if they knew the Products were misbranded pursuant to California and federal

regulations because its labeling made unauthorized and misleading nutrient content claims and omitted material information and disclosures.

116.    To be clear, Plaintiffs does not allege any claims pursuant to the FDCA and Sherman Law and relies on these regulations only to the extent they provide a predicate basis for liability under state and common law, as set forth herein.

### d.    The Products are Misbranded Because They Are False and Misleading

117.    Under FDCA section 403, a food is "misbranded" if "its labeling is false or misleading in any particular." *See* 21 U.S.C. §§ 343(a).

118.    The perceived healthiness of the Products has a material bearing on price and consumer acceptance.

119.    Defendant's Products are high in saturated fat at dangerous levels.

120.    Thus, Defendant is not permitted to make claims that the Product contains healthy fats.

121.    Because the Defendant fails to reveal the basic nature and characterizing properties of the Products, Defendant's Products are not only sold with misleading labeling but also misbranded under Sections 403(a) of the Food Drug & Cosmetic Act ("FDCA"), 21 U.S.C. §§ 343(a), and cannot be legally manufactured, advertised, distributed, or sold in the U.S. as it is currently labeled. *See* 21 U.S.C. § 331.

122.    Moreover, California law forbids the misbranding of food in language largely identical to that found in the FDCA.

123.    The Products are misbranded under California's Sherman Law, Cal. Health & Safety Code §§ 109875-111915. The Sherman Law expressly incorporates

GOOD GUSTAFSON AUMAIS LLP

the food labeling requirements set forth in the FDCA, *see* Cal. Health & Safety Code § 110100(a), and provides that any food is misbranded if its nutritional labeling does not conform to FDCA requirements. *See id.* § 110665; *see also id.* § 110670.

124.    The Sherman Law further provides that a product is misbranded if its labeling is "false or misleading." *Id.* § 110660. It is a violation of the Sherman Law to advertise any misbranded food, *id.* § 110398; to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded, *id.* § 110760; to misbrand any food, *id.* § 110765: or to receive in commerce any food that is misbranded or deliver or proffer it for delivery, *id.* § 110770.

125.    By misrepresenting the basic nature and characterizing properties of the Products, Defendant violates these federal and state regulations and misleads Plaintiffs and other reasonable consumers.

**F.  Reasonable consumers relied on Defendant's misrepresentations and omissions to their detriment.**

126.    Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

127.    Plaintiffs and the Class Members reasonably relied to their detriment on Defendant's misleading representations and omissions.

128.    Defendant's illegal, deceptive conduct leads reasonable consumers to believe that the Products contain "healthy fat," and are better, healthier, and more nutritious than competing products.

129.    Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the

general public, as they have already deceived and misled the Plaintiffs and the Class Members.

### G. Defendant's wrongful conduct caused Plaintiffs' and the Class Members' injuries.

130.   Defendant knows that consumers are willing to pay more for food products that are represented as healthy, healthful, better for them, and a healthier alternative to the competition.

131.   As a result of these unfair and deceptive practices, Defendant has likely collected millions of dollars from the sale of the Products that they would not have otherwise earned. Plaintiffs and Class Members paid money for food items that are not what they purported to be or what they bargained for. They paid a premium for the Products when they could have instead bought other, less expensive products that do not purport to contain the health benefits of Defendant's Products or include the mandatory disclosure language which puts the nutrient content claims in the proper context for consumers.

132.   In making the false and misleading representations described herein, Defendant knew and intended that consumers would pay for, and/or pay a premium for, a product labeled and advertised as healthy, healthful, better for them, and a healthier alternative to the competition.

133.   As an immediate, direct, and proximate result of Defendant's false and misleading representations, Defendant injured the Plaintiffs and the Class Members in that they:

     a.   Paid a sum of money for Products that were not what Defendant represented;

GOOD GUSTAFSON AUMAIS LLP

b. Paid a premium price for Products that were not what Defendant represented;

c. Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendant warranted;

d. Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented;

e. Could not be used for the purpose for which they were purchased; and

f. Were of a different quality than what Defendant promised.

134.    Had Defendant not made the false, misleading, and deceptive representations, Plaintiffs and the Class Members would not have been willing to pay the same amount for the Products they purchased, and, consequently, Plaintiffs and the Class Members would not have been willing to purchase the Products.

135.    Plaintiffs and the Class Members paid for Products that were purported to consist of healthy fats but received Products that consisted of dangerously high levels of saturated and trans fat.  The products Plaintiffs and the Class Members received were worth less than the products for which they paid.

136.    Based on Defendant's misleading and deceptive representations, Defendant was able to, and did, charge a premium price for the Products over the cost of competitive products not bearing the representations.

137.    Plaintiffs and the Class Members all paid money for the Products. However, Plaintiffs and the Class Members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions. Plaintiffs and the Class Members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products.

1   Consequently, Plaintiffs and the Class Members have suffered injury in fact and lost

2   money as a result of Defendant's wrongful conduct.

3   **H. Defendant Has Knowledge of These Regulations and Acts with
        Reckless Disregard**

4

5   138.   Defendant is keenly aware of the aforementioned regulations and

6   recklessly disregards them.

7   139.   For example, through its official Reddit account, the Defendant states:

8

9   rebelcreamery 2 points · 2 months ago · *edited 2 months ago*

    The net carb count, with that ingredients list, doesn't add up to me. We've been
10  making and calculating nutrition facts for keto ice cream mixes a long time. No idea.
    They could be playing with FDA loopholes. For example, Total Carbs are Class II
11  Nutrients, which must be present at 80% or more of the value declared on the label.
    In other words, HT's Chocolate Cheesecake has 49 total carbs on the label, and if a
12  lab tested and found it had 61 total carbs instead, they are legally compliant, since 49
    is 80% or more of 61. The FDA is presumably 'okay' with this since they view Carbs as
13  "good." Sugars, Fat, Calories are "Class III Nutrients," which you cannot understate
    (120% or less), but you could overstate, because they view them as "bad." Who
14  knows, but those net carb counts make no sense to me when you add in skim milk,
    banana, wheat, sugar, etc.
15

16

17  Rebel's calories are in the middle of Halo Top low calorie and Ben & Jerry's. It's
    relatively low calorie compared to regular ice cream. If calories are the issue, why not
18  just eat less? There are three ways to reduce calories: reduce fat (but this increases
    net carbs and sugar as a percentage of the mix, and worsens texture and mouthfeel
19  IMO), reduce mix-ins, or increase air. You get what you pay for. Halo Top is able to get
    both the low calorie and keto lines lower in carbs and calories by pumping more air
20  into the ice cream and putting in the bare minimum of mix-ins. It's an illusion. They
    also use skim milk, the first/main ingredient in both product lines, which increases
21  the % of sugar in the mix. Most HT's keto pints range between 410 and 500 calories,
    excluding PB flavor. Rebel is mostly between 520 and 660, excluding PB, BP flavors.
22  So Rebel is on average ~100 calories more per pint.
23

24  Personally, calorie for calorie, I'd rather have less ice cream that had a lot less sugar,
    lots of mix-ins, more healthy fats, and less air than... more ice cream with more
25  sugar, hardly any mix-ins, less fat, and more air. Yes, 100 calories of the former is
    "volumetrically less" than 100 calories of the latter... But the only way you get
26  "volumetrically more" ice cream without increasing calories is an illusion. It's worse
    things: more air, less mix-ins, more sugar, less fat. You get what you pay for.
27

28

– 29 –

CLASS ACTION COMPLAINT

140. Additionally, in a different discussion, Defendant states:

> **rebelcreamery** 10 points · 6 months ago · *edited 6 months ago*
>
> Is this for net carbs or total carbs? The FDA doesn't involve itself in net carbs but only in the rounding of Total Carbs, Fiber, and Sugar Alcohols (if applicable).
>
> If a product has 0.9 total carbs, it would have to round up to 1g. You can round down if it's less than 0.5 per serving. For example, a product is "sugar-free" if total sugars are below 0.5 per serving. All flavors of Rebel Ice Cream are legally sugar-free, because total sugars are between 0.25 and 0.40 per serving (depending on the flavor). A few flavors will no longer be sugar-free when the FDA changes an ice cream serving to 2/3 cup later this year, and we will put <1g for sugar since they will be around 0.70 per serving at 2/3 cup instead of 1/2 cup.
>
> But there are nuances with Total Carbohydrates and Fiber. They are considered Class II nutrients by the FDA. "Class II nutrients must be present at 80% or more of the value declared on the label." So, if an ice cream puts 10g, but a test discovered it had 12.0g of carbs, 80% of 12.0 is 9.6, so they are legally fine with only 10g on the label. Then they could overstate fiber in order to assure implied net carbs (what the consumer is calculating on their own) is minimized. This is all legal. I would hope companies wouldn't take advantage of these loopholes. We could be consuming a lot more carbs than we think, especially when you're multiplying by multiple servings. In this example (listing 10g carbs even though it's actually 12g), that is 2 x 4 servings (8 EXTRA carbs per pint) you are consuming that you didn't even realize. This is why we go by the exact decimals. If a low carb ice cream has skim milk, peanuts, and even sugar listed in the ingredients, yet claims only 1g net carb per serving, I would be skeptical. The heavy cream alone in a keto ice cream mix is making up all of that 1g, and even in very small amounts, the peanuts, skim milk, and sugar is going to increase that significantly. 🙇

141. As shown above, Defendant has a detailed knowledge of food regulations.

142. Further, Defendant tells consumers that the FDA and competitors are not to be trusted:

rebelcreamery 2 points · 2 months ago

Yeah, I personally think it best everyone is skeptical of the FDA and any nutrition label, to start. Brands need to earn trust on what exactly their claims are. Keto is hot right now, so money and products will pour in. Some will be great products, some will be bogus. Best not trust the FDA to make the right calls or moves no matter what. It's a shame since many are new to keto, but hopefully the right information spreads online. I don't trust anything with lots of fiber. :) But luckily many are testing their blood, so word can spread. Like with SmartSweets. Another high fiber product known to spike blood sugar. They just reformulated, might be better now, but still some IMO fiber along with the corn fiber.

Reply  Share  •••

143.    True to its name, Defendant is a rebel to "decades of sound science" and federal regulations.

144.    Rebel knows the rules, the regulations, and the reasonable consumers' interpretation of the Products' representations yet continues to mislead and deceive.

**CLASS DEFINITIONS AND ALLEGATIONS**

145.    Plaintiffs, pursuant to Federal Rule of Civil Procedure 23, bring this action on behalf of the following classes:

    a.  California Class: All persons who purchased Defendant's Products within the State of California and within the applicable statute of limitations;

    b.  Nationwide Class: All persons who purchased Defendant's Products within the United States and within the applicable statute of limitations period (collectively, the "Class," "Classes," and "Class Members").

146.    Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the Products for resale, all

persons who make a timely election to be excluded from the Classes, the judge to whom the case is assigned and any immediate family members thereof, and those who assert claims for personal injury.

147.   The members of the Classes are so numerous that joinder of all Class Members is impracticable. Defendant has sold, at a minimum, hundreds of thousands of units of the Products to Class Members.

148.   There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the putative classes that predominate over questions that may affect individual Class Members include, but are not limited to the following:

a.   whether Defendant misrepresented material facts concerning the Products on the packaging of every product;

b.   whether Defendant misrepresented material facts concerning the Products in print and digital marketing of every product;

c.   whether Defendant's conduct was unfair and/or deceptive;

d.   whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiffs and the Class;

e.   whether Plaintiffs and the Class are entitled to equitable and/or injunctive relief;

f.   whether Defendant breached implied and express warranties to Plaintiffs and the Class; and

CLASS ACTION COMPLAINT

GOOD GUSTAFSON AUMAIS LLP

g. whether Plaintiffs and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

149. Plaintiffs' claims are typical of those of other Class Members because Plaintiff, like all members of the classes, purchased Defendant's Products bearing the healthy representations and Plaintiffs sustained damages from Defendant's wrongful conduct.

150. Plaintiffs will fairly and adequately protect the interests of the Classes and has retained counsel that is experienced in litigating complex class actions.

151. Plaintiffs have no interests which conflict with those of the Classes.

152. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

153. The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the

GOOD GUSTAFSON AUMAIS LLP

classes, thereby making appropriate equitable relief with respect to the classes as a whole.

154.   The prosecution of separate actions by members of the Classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the classes even where certain Class Members are not parties to such actions.

## CAUSES OF ACTION

### COUNT I
### Violation of California's Unfair Competition Law ("UCL")
### Business and Professions Code § 17200 et seq.
### (On Behalf of the California Class)

155.   Plaintiff Davis repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

156.   Plaintiff Davis brings this cause of action pursuant to the UCL on their own behalf and on behalf of all other persons similarly situated.

157.   The UCL prohibits "any unlawful, unfair... or fraudulent business act or practice." Cal. Bus & Prof. Code § 17200.

**A. Unlawful Prong**

158.   The UCL identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.*, 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

159.   Defendant's labeling and advertising of the Products, as alleged in the preceding paragraphs, violates California Civil Code Section 1750, et seq. (Consumer

Legal Remedies Act), California Business and Professions Code Section 17500, et seq. (False Advertising Law), Cal. Heath & Saf. Code § 110765 et seq. (the "Sherman Law"), and the common law as described herein.

160.    Defendant's packaging, labeling, and advertising of the Products, as alleged in the preceding paragraphs, is false, deceptive, misleading, and unreasonable, and constitutes unlawful conduct.

161.    Defendant knew or should have known of their unlawful conduct.

162.    As alleged in the preceding paragraphs, the misrepresentations by Defendant detailed above constitute an unlawful business practice within the meaning of the UCL.

163.    There were reasonably available alternatives to further Defendant's legitimate business interests other than the conduct described herein. Defendant could have refrained from misrepresenting the true characteristics of the Products.

164.    All of the conduct alleged herein occurred and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

165.    Pursuant to California Business and Professions Code Section 17203, Plaintiff Davis and the California Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of false and deceptive advertising of the Products. Likewise, Plaintiff Davis and the California Class seek an order requiring Defendant to disclose such misrepresentations, and additionally request an order awarding Plaintiff Davis restitution of the money wrongfully acquired by Defendant by means of responsibility attached to Defendant's

failure to disclose the existence and significance of said misrepresentations in an amount to be determined at trial.

166.   Plaintiff Davis and the California Class have suffered injury in fact and have lost money as a result of Defendant's unlawful conduct. Plaintiff Davis paid an unwarranted premium for the Product. Plaintiff Davis would not have purchased the Products if she had known that Defendant purposely deceived consumers into believing that the Products were healthy, healthful, better for them, and a healthier alternative to the competition.

167.   As a result of the business acts and practices described above, Plaintiff Davis and members of the California Class, pursuant to § 17203, are entitled to an order enjoining such future wrongful conduct on the part of Defendant and such other orders and judgments that may be necessary to disgorge Defendant's ill-gotten gains and to restore to any person in interest any money paid for the Products as a result of the wrongful conduct of Defendant.

168.   Pursuant to Civil Code § 3287(a), Plaintiff Davis and the California Class are further entitled to prejudgment interest as a direct and proximate result of Defendant's unfair and fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiffs and the California Class are entitled to interest in an amount according to proof.

**B. Unfair Prong**

169.   Under the UCL a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California*, 142 Cal. App. 4th 1394, 1403 (2006).

GOOD GUSTAFSON AUMAIS LLP

170.    Defendant's advertising and labeling of the Products as being healthy, healthful, better for them, and a healthier alternative to the competition, when the Products contain dangerously high levels of saturated fat, is false, misleading, and deceptive.

171.    Defendant's false advertising of the Products causes injuries to consumers, who do not receive the promised benefits from the Products in proportion to their reasonable expectations.

172.    Through false, misleading, and deceptive labeling of the Products, Defendant seeks to take advantage of consumers' desire for healthy food products, while reaping the financial benefits of manufacturing Products that are not as healthy as represented.

173.    When Defendant labels and markets the Products as being healthy, healthful, better for them, and a healthier alternative to the competition, it provides false promises to consumers and stifles competition in the marketplace.

174.    Consumers cannot avoid any of the injuries caused by Defendant's false and misleading advertising of the Products.

175.    Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under the UCL. The courts "weigh the utility of the defendant's conduct against the gravity of the harm alleged to the victim." *Davis v. HSBC Bank Nevada, N.A.*, 691 F. 3d 1152, 1169 (9th Cir. 2012).

176.    Defendant's material misrepresentations and omissions result in financial harm to consumers. Thus, the utility of Defendant's conduct is vastly outweighed by the gravity of its harm.

177.    Some courts require the "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.*, 504 F. 3d 718, 735 (9th Cir. 2007).

178.    As described herein, Defendant's conduct impacts the public health of Americans and the competitive landscape for Defendant's competitors that act as good faith market participants.

179.    Defendant's advertising and labeling of the Products, as alleged in the preceding paragraphs, is false, deceptive, misleading, and unreasonable, and constitutes unfair conduct.

180.    Defendant knew or should have known of its unfair conduct.

181.    As alleged in the preceding paragraphs, the material misrepresentations by Defendant detailed above constitute an unfair business practice within the meaning of the UCL.

182.    There were reasonably available alternatives to further Defendant's legitimate business interests other than the conduct described herein. Defendant could have marketed the Products without making any false and deceptive statements about the Products' ingredients.

183.    All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on hundreds of occasions daily.

184.    Pursuant to Business & Professions Code Section 17203, Plaintiff Davis and the California Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of false and deceptive advertising and labeling of the Products. Plaintiff Davis and California Class Members

GOOD GUSTAFSON AUMAIS LLP

additionally request an order awarding Plaintiff Davis and California Class Members restitution of the money wrongfully acquired by Defendant by means of responsibility attached to Defendant's failure to disclose the existence and significance of said misrepresentations in an amount to be determined at trial.

185.    Plaintiff Davis and the California Class have suffered injury in fact and have lost money as a result of Defendant's unfair conduct. Plaintiffs paid an unwarranted premium for the Products.

**C. Fraudulent Prong**

186.    The UCL considers conduct fraudulent and prohibits said conduct if it is likely to deceive members of the public. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992).

187.    Defendant's labeling and advertising of the Products as being healthy, healthful, better for them, and a healthier alternative to the competition is likely to deceive members of the public into believing that the Products are healthier and better for consumers that they are in reality.

188.    Defendant's advertising of the Products, as alleged in the preceding paragraphs, is false, deceptive, misleading, and unreasonable and constitutes fraudulent conduct.

189.    Defendant knew or should have known of its fraudulent conduct.

190.    As alleged in the preceding paragraphs, the material misrepresentations and omissions by Defendant detailed above constitute a fraudulent business practice in violation of the UCL.

191.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein. Defendant

could have refrained from marketing and labeling the Products as being healthy, healthful, better for them, and a healthier alternative to the competition.

192.    All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on hundreds of occasions daily.

193.    Pursuant to Business & Professions Code Section 17203, Plaintiff Davis and the California Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of false and deceptive advertising of the Products. Likewise, Plaintiff Davis and the California Class seek an order requiring Defendant to disclose such misrepresentations, and additionally request an order awarding Plaintiff Davis restitution of the money wrongfully acquired by Defendant by means of responsibility attached to Defendant's failure to disclose the existence and significance of said misrepresentations in an amount to be determined at trial.

194.    Plaintiff Davis and the California Class have suffered injury in fact and have lost money as a result of Defendant's fraudulent conduct. Plaintiff Davis and the California Class paid an unwarranted premium for the Products. Plaintiff Davis and the California Class would not have purchased the Products if they had known that the Products were not healthy, healthful, better for them, and a healthier alternative to the competition as represented by Defendant.

195.    Because Plaintiff Davis' claims under the "unfair" prong of the UCL sweep more broadly than her claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiff Davis' legal remedies are inadequate to fully compensate Plaintiff Davis for all of Defendant's challenged behavior.

GOOD GUSTAFSON AUMAIS LLP

196.    Because the Court has broad discretion to award restitution under the UCL and could, when assessing restitution under the UCL, apply a standard different than that applied to assessing damages under the CLRA or commercial code (for Plaintiff Davis' breach of warranty claims), and restitution is not limited to returning to Plaintiff Davis and California Class Members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the UCL, and are therefore inadequate.

**COUNT II**
**Violation of California's False Advertising Law ("FAL")**
**Business and Professions Code § 17500 et seq.**
**(On Behalf of the California Class)**

197.    Plaintiff Davis repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

198.    Plaintiff Davis brings this cause of action pursuant to the FAL on their own behalf and on behalf of all other persons similarly situated.

199.    The FAL makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, in any advertising device or in any other manner or means whatever, including over the Internet, any statement, concerning personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

200.    Defendant knowingly disseminated misleading claims regarding the Products in order to mislead the public about the health benefits of the Products.

201.    Defendant controlled the labeling, packaging, production and advertising of the Products. Defendant knew or should have known, through the exercise of reasonable care, that its representations and omissions about the characteristics and ingredients of the Products were untrue, deceptive, and misleading.

202.    Defendant understands that the public values "healthy" representations, and this is shown by the numerous statements that are prominently featured throughout the Products' packaging.

203.    Defendant's actions in violation of the FAL were false and misleading such that the general public is and was likely to be deceived.

204.    As a direct and proximate result of Defendant's conduct alleged herein in violation of the FAL, Plaintiff Davis and members of the California Class, pursuant to § 17535, are entitled to an order of this Court enjoining such future wrongful conduct on the part of Defendant, and requiring Defendant to disclose the true nature of its misrepresentations.

205.    Plaintiff Davis and the California Class have suffered injury in fact and have lost money as a result of Defendant's false representations. Plaintiff Davis and the California Class purchased the Products in reliance upon the claims and omissions by Defendant that the Products are healthy, healthful, better for them, and a healthier alternative to the competition, as represented by Defendant's labeling and advertising. Plaintiff Davis and the California Class would not have purchased the

GOOD GUSTAFSON AUMAIS LLP

Products if she had known that the claims and advertising as described herein were false and misleading.

206.    Plaintiff Davis and members of the California Class also request an order requiring Defendant to disgorge its ill-gotten gains and/or award full restitution of all monies wrongfully acquired by Defendant by means of such acts of false advertising, plus interests and attorneys' fees.

207.    Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA or commercial code (for Plaintiff Davis' breach of warranty claims), and restitution is not limited to returning to Plaintiff Davis and California Class Members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

**COUNT III**
**Violation of California's Consumer Legal Remedies Act ("CLRA")**
**Business and Professions Code § 1750 et seq.**
**(Injunctive Relief Only)**
**(On Behalf of the California Class)**

208.    Plaintiff Davis repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

209.    Plaintiff Davis brings this claim individually and on behalf of the members of the proposed California Class against the Defendant.

210.    At all times relevant hereto, Plaintiff Davis and members of the California Class were "consumer[s]," as defined in Civil Code section 1761(d).

GOOD GUSTAFSON AUMAIS LLP

211. At all times relevant hereto, Defendant is a "person," as defined in Civil Code section 1761(c).

212. At all times relevant hereto, the Products manufactured, marketed, advertised, and sold by Defendant constituted "goods," as defined in Civil Code section 1761(a).

213. The purchases of the Products by Plaintiff Davis and members of the California Class were and are "transactions" within the meaning of Civil Code section 1761(e).

214. Defendant disseminated, or caused to be disseminated, through its packaging, labeling, marketing and advertising misrepresentations that the Products were healthy and healthful by the large representations that the fats contained therein are good for the public's health.

215. Defendant's representations violate the CLRA in at least the following respects:

a. In violation of Civil Code § 1770(a)(5), Defendant represented that the Products have characteristics, ingredients, uses, benefits, and quantities which they do not have;

b. In violation of Civil Code § 1770(a)(7), Defendant represented that the Products are of a particular standard, quality, or grade, which they are not;

c. In violation of Civil Code § 1770(a)(9), Defendant advertised the Products with an intent not to sell the products as advertised; and

d. In violation of Civil Code § 1770(a)(16), Defendant representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

GOOD GUSTAFSON AUMAIS LLP

216.     Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiff Davis provided notice to Defendant of the alleged violations of the CLRA, demanding that Defendant correct such violations, and providing it with the opportunity to correct its business practices. Notice was sent via certified mail, return receipt requested on June 18, 2022. As of the date of filing this complaint, Defendant has not responded. Accordingly, if after 30 days no satisfactory response to resolve this litigation on a class-wide basis has been received, Plaintiff Davis will seek leave to amend this request to seek restitution and actual damages as provided by the CLRA.

217.     Pursuant to California Civil Code § 1780, Plaintiff Davis seeks injunctive relief, reasonable attorneys' fees and costs, and any other relief that the Court deems proper.

218.     Defendant knew or should have known that the Products did not contain the claimed characteristics because Defendant manufactured, marketed and sold the Products without those characteristics that they claimed. Defendant knew or should have known that the representations about The Products as described herein violated consumer protection laws, and that these statements would be relied upon by Plaintiffs and members of the California Class.

219.     Defendant's actions as described herein were done with conscious disregard of Plaintiff Davis' and California Class Members' rights and was wanton and malicious.

220.     Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA since Defendant is still representing that its Products have characteristics which they do not have.

1
2
3

**COUNT IV**
**Breach of Express Warranties**
**(On Behalf of the Nationwide Class)**

4      221.   Plaintiffs repeat and reallege each and every allegation contained in the

5  foregoing paragraphs as if fully set forth herein.

6      222.   Plaintiffs bring this claim individually and on behalf of the members of

7
8  the proposed Classes against the Defendant.

9      223.   Through the following claims on the Products' labeling, Defendant made

10  affirmations of fact or promises, or description of goods that the Products are

11  "healthful" through representations that the Products are healthy and contain

12
13  healthy fats.

14      224.   These and other representations were "part of the basis of the bargain,"

15  in that Plaintiffs and the Class Members purchased the Products in reasonable

16  reliance on those statements.

17      225.   Defendant breached its express warranties by selling Products that are

18
19  not healthful, but rather that negatively affects cholesterol levels, increasing risk of

20  CHD, stroke, and other morbidity.

21      226.   That breach actually and proximately caused injury in the form of the

22  lost purchase price that Plaintiffs and Class Members paid for the Products.

23      227.   As a result, Plaintiffs seeks, on behalf of herself and the Class Members,

24
25  actual damages arising as a result of Defendant's breaches of express warranty.

26
27
28

GOOD GUSTAFSON AUMAIS LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GOOD GUSTAFSON AUMAIS LLP

**COUNT V**
**Breach of Implied Warranty of Merchantability**
**(On Behalf of the Nationwide Class)**

228.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

229.    Plaintiffs bring this Count individually and on behalf of the members of the proposed Classes against the Defendant.

230.    Defendant, through its acts set forth herein, in the sale, marketing, and promotion of the Product, made representations to Plaintiffs and the Class that regarding the health and nutrition properties of the Products through the promise that the Products are healthy, nutritious, and consist of healthy fats.

231.    Defendant is a merchant with respect to the goods of this kind which were sold to Plaintiffs and the Class Members, and there was, in the sale to Plaintiffs and other consumers, an implied warranty that those goods were merchantable.

232.    However, Defendant breached that implied warranty in that the Products are not healthy, but negatively affects cholesterol levels, increasing among other things risk of CHD and stroke.

233.    As an actual and proximate result of Defendant's conduct, Plaintiffs and the Class Members did not receive goods as impliedly warranted by Defendant to be merchantable in that they did not conform to promises and affirmations made on the container or label of the goods.

234.    Plaintiffs and the Class Members have sustained damages as a proximate result of the foregoing breach of implied warranty in the amount of the Products' purchase price.

**COUNT VI**
**Unjust Enrichment**
**(On Behalf of the Nationwide Class)**

235.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

236.   By means of Defendant's wrongful conduct alleged herein, Defendant knowingly sold the Products to Plaintiffs and Class Members in a manner that was unfair, unconscionable, and oppressive.

237.   Defendant knowingly received and retained wrongful benefits and funds from Plaintiffs and the Class Members. In so doing, Defendant acted with conscious disregard for the rights of Plaintiffs and members of the Class.

238.   As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

239.   Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

240.   Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, without justification, from selling the Products to Plaintiffs and members of the Class in an unfair, unconscionable, and oppressive manner. Defendant's retention of such funds under such circumstances making it inequitable to do so constitutes unjust enrichment.

241.   The financial benefits derived by Defendant rightfully belong to Plaintiffs and members of the Class. Defendant should be compelled to return in a common fund for the benefit of Plaintiffs and members of the Class all wrongful or inequitable proceeds received by Defendant.

GOOD GUSTAFSON AUMAIS LLP

**RELIEF DEMANDED**

242.    WHEREFORE, Plaintiffs, individually and on behalf the Class Members, seeks judgment and relief against Defendant, as follows:

a)  For an order declaring: (i) this is a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the proposed Classes described herein; and (ii) appointing Plaintiffs to serve as representatives for the Classes and Plaintiffs' counsel to serve as Class Counsel;

b)   For an order enjoining Defendant from continuing to engage in the unlawful conduct set forth herein;

c)  For an order awarding restitution of the monies Defendant wrongfully acquired by its illegal and deceptive conduct;

d)  For an order requiring disgorgement of the monies Defendant wrongfully acquired by its illegal and deceptive conduct;

e)  For compensatory and punitive damages, including actual and statutory damages, arising from Defendant's wrongful conduct and illegal conduct;

f)  For an award of reasonable attorneys' fees and costs and expenses incurred in the course of prosecuting this action; and

g)  For such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiffs demand a jury trial on all causes of action so triable.

CLASS ACTION COMPLAINT

GOOD GUSTAFSON AUMAIS LLP

Dated: July 11, 2022

**Good Gustafson Aumais LLP**

/s/ Ryan Gustafson
Ryan Gustafson (Cal. Bar No. 220802)
2330 Westwood Blvd., No. 103
Los Angeles, CA 90064
Tel: (310) 274-4663
jrg@ggallp.com

**Shenaq PC**

/s/ Amir Shenaq
Amir Shenaq, Esq.*
3500 Lenox Road, Ste 1500
Atlanta, GA 30326
Tel: (888) 909-9993
amir@shenaqpc.com

**The Keeton Firm LLC**

/s/ Steffan T. Keeton
Steffan T. Keeton, Esq.*
100 S Commons Ste 102
Pittsburgh PA 15212
Tel: (888) 412-5291
stkeeton@keetonfirm.com

*Pro hac vice forthcoming*

*Counsel for Plaintiffs and the Proposed Class*

CLASS ACTION COMPLAINT